TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-00-00439-CV






Cross Creek Investments, Inc. d/b/a Cross Creek Apartments, Appellant



v.



First State Bank, Appellee







FROM THE COUNTY COURT AT LAW NO. 1 OF TRAVIS COUNTY


NO. 239,676, HONORABLE J. DAVID PHILLIPS, JUDGE PRESIDING







 Appellant Cross Creek Investments, Inc. d/b/a Cross Creek Apartments ("Cross
Creek") sued First State Bank, now known as Wells Fargo Bank Texas, N.A. ("the Bank"), for
wrongful payment of forged checks drawn on Cross Creek's account. The trial court granted
summary judgment for the Bank, and Cross Creek appeals. We affirm the judgment.


Background

 Cross Creek opened a commercial checking account with the Bank in 1993. The
account was governed by an Account Agreement, which provides as follows:


We [the Bank] will furnish a periodic statement to you [Cross Creek] regarding
your account . . . . You will be deemed to have received your statement five days
after its date. You agree to examine your statement or the items therein for any
unauthorized signature, unauthorized payment, missing signature, alteration, or
other irregularities, and notify us promptly in writing of the problem.


You must examine your statement of account with "reasonable promptness." If
you discover (or reasonably should have discovered) any unauthorized payments,
signatures or alterations, you must promptly notify us of the relevant facts. As
between you and us, if you fail to do either of these duties, you will have to either
share the loss with us or bear the loss entirely yourself, depending on whether we
used ordinary care and, if not, whether we substantially contributed to the loss. 
The loss could be not only with respect to items on the statement but other items
with unauthorized signatures or alterations by the same wrongdoer.


You agree that "reasonable promptness" means you must examine your statement
and report to us within fourteen days of when the statement is first sent or made
available to you. In special circumstances, "reasonable promptness" may mean
thirty days, but it will not, in any circumstance, exceed a total of thirty days from
when the statement is first sent or made available to you.


You further agree that if you fail to report any unauthorized signatures, alterations,
forgeries or any other errors in your account within sixty days of when we first
send or make the statement available, you cannot assert a claim against us on any
items in that statement, and as between you and us the loss will be entirely yours. 
This sixty-day limitation is without regard to whether we used ordinary care.



 The Account Agreement also states that the customer must safeguard its blank
checks and would be responsible for losses should it fail to safeguard its checks. The Account
Agreement explains that "most items" are not individually examined for signatures, but are sent
through an automated process, and provides that, "You [Cross Creek] agree that our verifications
of some but not all items is in accordance with reasonable commercial standards of the banking
business and that you have responsibility for preventing and reporting forgeries, alterations, and
other unauthorized uses of your checks or accounts." (1)

 On July 30, 1997, Cross Creek president Tony Kalantari hired Bettinna Jellison. (2) 
Jellison had no job duties that should have brought her into contact with Cross Creek's checks. 
Kalantari had the responsibility to write checks and review Cross Creek's bank statements and
kept all blank checks in a credenza in his office. The credenza was locked at all times, and only
Kalantari and his wife had the keys. On August 27, 1997, Jellison stopped coming to work. On
October 15, 1997, Kalantari discovered that Jellison had forged his signature on over forty Cross
Creek checks ranging from $327.94 to $589.27 and totaling $20,143.77. Two checks were
written in late August and were included in Cross Creek's August bank statement, dated August
29, 1997. Most of the checks were cleared in September and were included in the September 30
statement. The last two of the forged checks cleared the Bank on October 1, and were included
in the October 27 statement. Kalantari notified the Bank of the forgeries on October 16. Cross Creek sued the Bank, alleging the checks were wrongly paid. The Bank
moved for summary judgment on the grounds that (1) Cross Creek failed to safeguard its blank
checks, (2) the Bank was not negligent in paying the checks, and (3) recovery was barred by the
Account Agreement and section 4.406 of the Texas Business and Commerce Code. Tex. Bus. &
Comm. Code Ann. § 4.406 (West Supp. 2001). The trial court granted summary judgment
without specifying its grounds.


Discussion


 Cross Creek argues the trial court erred in granting the Bank's motion for summary
judgment because there are genuine issues of fact as to whether Cross Creek's claims are barred
by the Account Agreement and by statute. (3) Cross Creek argues it had thirty days to inspect its
statements and report any forgeries, and that it may recover for forgeries paid in the thirty days
following its receipt of the August statement that showed the initial forgeries.

 Summary judgment is properly granted only when the movant establishes that there
are no genuine issues of material fact to be decided and that it is entitled to judgment as a matter
of law. Tex. R. Civ. P. 166a(c); Lear Siegler, Inc. v. Perez, 819 S.W.2d 470, 471 (Tex. 1991);
Memorial Med. Ctr. v. Howard, 975 S.W.2d 691, 692 (Tex. App.-Austin 1998, pet. denied). 
In reviewing the granting of summary judgment, we view the evidence in the light most favorable
to the non-movant, making every reasonable inference and resolving all doubts in its favor. 
Howard, 975 S.W.2d at 693. When the order granting summary judgment does not specify the
grounds relied upon, we will affirm the judgment if it is supported by any of the grounds put forth
by the movant. Bradley v. State ex rel. White, 990 S.W.2d 245, 247 (Tex. 1999); Howard, 975
S.W.2d at 693.

 The Texas Business and Commerce Code imposes on bank customers a duty to
inspect their bank statements with reasonable promptness and report any unauthorized signatures
to the bank. Tex. Bus. & Comm. Code Ann. § 4.406(c) (West Supp. 2001). If a bank customer
fails to so inspect and report, the customer is precluded from asserting against the bank:


(1) the customer's unauthorized signature or any alteration on the item, if the
bank proves that it suffered a loss by reason of the failure; and 


(2) the customer's unauthorized signature or alteration by the same wrongdoer on
any other item paid in good faith by the bank if the payment was made before
the bank received notice from the customer of the unauthorized signature or
alteration and after the customer had been afforded a reasonable period of
time, not exceeding 30 days, in which to examine the item or statement of
account and notify the bank.



Id. § 4.406(d). Comments to the Uniform Commercial Code, from which section 4.406 is drawn,
note that section 4.406(d)(2) follows case law holding that: 


payment of an additional item or items bearing an unauthorized signature or
alteration by the same wrongdoer is a loss suffered by the bank traceable to the
customer's failure to exercise reasonable care . . . in examining the statement and
notifying the bank of objections to it. One of the most serious consequences of
failure of the customer to [examine a statement with reasonable promptness] is the
opportunity presented to the wrongdoer to repeat the misdeeds.



U.C.C. § 4-406 cmt. 2 (1990). Parties may modify section 4.406's provisions by agreement, as
long as the agreement does not allow the bank to avoid responsibility or limit damages for any
lack of good faith or ordinary care on its part. Tex. Bus. & Comm. Code Ann. § 4.103(a) (West
Supp. 2001); American Airlines Employees Fed. Credit Union v. Martin, 29 S.W.3d 86, 95 (Tex.
2000).


1.  Does the Account Agreement control?

 Cross Creek argues that the Account Agreement is unreasonable and should be
disregarded. Cross Creek asserts it is nonsensical to allow a bank to escape liability when notified
thirty-one days after an initial forgery is shown on a bank statement but to hold the same bank
liable if the forgeries are reported only one day earlier. Cross Creek further contends:


The public considers their checking accounts secure. It would surprise the public
if due to no fault of the customer, forged checks could be drawn on their account. 
Maybe the customer is on vacation or some personal crisis develops and the
customer fails to report the forgeries within the 30-day window. The Bank should
not be able to pass these types of losses to its customers. The Bank should take
that loss.


Finally, it argues that the Account Agreement "goes well beyond the [section] 4.406 protections
. . . and ultimately forces customers to bear the loss or forces them into litigation," noting that
the thirty-day time frame was intended "to avoid disputes."

 The UCC attempts "'to permit the continued expansion of commercial practices
through customs, usage and agreement of the parties' and 'to make uniform the law among the
various jurisdictions.'" Martin, 29 S.W.3d at 93 (citing Tex. Bus. & Com. Code Ann. § 1.102
(West. 1994)). In fact, the UCC seeks to do exactly what Cross Creek argues against. That is,
it allocates responsibility to the bank customer as the party best able to prevent a loss. U.C.C.
§ 4.406 cmt. 2. The UCC justifies this allocation of risk because the customer is more familiar
with its signature and whether it authorized a particular transaction, and therefore can better
prevent further forgeries than can a bank processing thousands of transactions each day. Id. We
disagree with Cross Creek that banks should not be able to pass forgery losses to customers who
fail to examine their bank statements promptly. The UCC is designed to promote uniformity and
continued expansion of commercial dealings, and placing the burden of discovering forgeries on
the customers who are charged with knowledge about their bank accounts furthers those goals.

 By the Account Agreement, Cross Creek and the Bank agreed to modify section
4.406 to require Cross Creek to examine its bank statements and notify the Bank of forgeries
within fourteen days of receiving the statements. The Account Agreement provided that under
some circumstances, Cross Creek might have up to thirty days to examine a statement and notify
the Bank of any forgeries. The Account Agreement also stated that the Bank might not be liable
for multiple forgeries by the same person if Cross Creek failed to timely notify the Bank of the
first forgery. The Account Agreement did not attempt to disclaim the Bank's responsibility to use
good faith and ordinary care, nor did it limit damages for which the Bank might be liable should
it fail to use such care or good faith.

 The Account Agreement's statement that the customer will bear the loss of the
initial forgery and other forgeries by the same wrongdoer should the customer fail to inspect its
statement with reasonable promptness is consistent with section 4.406 in that it puts the burden
on the customer, who is best equipped to discover the forgery, in an attempt to reduce losses
caused by multiple forgeries by the same person. Section 4.406 emphasizes that the customer
should bear the loss caused by repeated forgeries by the same wrongdoer when it fails to inspect
statements and report forgeries promptly. Tex. Bus. & Comm. Code Ann. § 4.406(d)(2); Martin,
29 S.W.3d at 92, 94. The Account Agreement properly modified section 4.406, and Cross Creek
is bound by its terms. See Tex. Bus. & Comm. Code Ann. § 4.103(a); Martin, 29 S.W.3d at 96.


2.  May Cross Creek bring a claim for any of the forgeries?

 Whether viewed under the Account Agreement or section 4.406(d), Cross Creek
clearly is barred from claiming against the Bank on the first two forgeries, which were paid in
August, reflected on the August statement, and reported more than forty days after Cross Creek
received the August statement. Further, under the Account Agreement, Cross Creek was bound
to inspect the statement and report any forgeries within fourteen days of receipt or bear the loss
for subsequent forgeries by the same wrongdoer. Therefore, Cross Creek is also barred from
making claims for the checks paid after September 17, fourteen days after Cross Creek is deemed
to have received the August statement. The only checks for which the Bank might arguably be
liable are those paid in the fourteen days following Cross Creek's receipt of the August statement. (4) 

 Section 4.406 provides that a bank customer who does not examine its statements
and report discovered forgeries with reasonable promptness may not assert against a bank further
forgeries by the same person "if the payment was made before the bank received notice . . . and
after the customer had been afforded a reasonable period of time . . . in which to examine the item
or statement of account and notify the bank." Tex. Bus. & Comm. Code Ann. § 4.406(d)(2)
(emphasis added).

 Cross Creek argues it cannot be barred from recovering for the forged checks
unless they were paid before the Bank got notice and after Cross Creek had the prescribed time
to examine the August statement. (5) Therefore, it argues, the Bank still bears the loss for items paid
in the interim fourteen days after Cross Creek received the August statement. (6) The Bank urges
that section 4.406 should be read to bar claims for all forgeries by the same wrongdoer when the
customer does not timely report the initial forgery. It contends that Cross Creek's argument
removes "the necessary incentive for customers to police their accounts so that multiple
unauthorized items are not paid."

 While the intent of the statute seems to support the Bank's view, we cannot ignore
the clear language of the statute, which states that a bank is protected from liability for an initial
forgery not timely reported and for forgeries paid after the customer has had time to inspect a
statement. Id. We therefore examine the Account Agreement to determine whether it bars Cross
Creek from bringing a claim for those interim losses paid between August 30 and September 17.

 The Account Agreement states Cross Creek would bear the entire loss for a forgery
not timely reported if the Bank used ordinary care, and Cross Creek does not argue that the Bank
failed to use ordinary care. The Account Agreement goes on to state that the loss "could be not
only with respect to items on the statement but other items with unauthorized signatures or
alterations by the same wrongdoer." The Bank, in its motion for summary judgment, pointed to
this clause and argued Cross Creek's claims were barred by the Account Agreement. As
discussed above, Cross Creek is bound by the Account Agreement. Therefore, Cross Creek, by
failing to timely examine and report its August statement, is barred from bringing a claim against
the Bank for any losses it suffered due to Jellison's forgeries.

Conclusion

 Having determined that Cross Creek was bound by the terms of the Account
Agreement and failed to examine its statements and report the initial forgeries promptly, we hold
Cross Creek may not assert a claim against the Bank for any of Jellison's forgeries. The trial
court properly granted summary judgment in favor of the Bank. We overrule Cross Creek's point
of error and affirm the trial court's judgment.



 

 Jan P. Patterson, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Patterson

Affirmed

Filed: May 3, 2001

Do Not Publish

1. Summary judgment evidence showed that the Bank's policy at the time of the forgeries was
to verify only checks written for $2,500 or more.
2. Jellison is referred to in the record as "Bettinna," "Bettina," and "Benitta."
3. Cross Creek also urges that it raised a fact issue as to whether it examined its statements
and reported the forgeries with reasonable promptness by attaching Kalantari's affidavit to its
response to the Bank's motion for summary judgment. In his affidavit, Kalantari stated: 


I maintain numerous business accounts and am responsible for examining hundreds
of transactions per month. I examined my August 1997 First State Bank statement
with promptness - within 30 days of its receipt. As soon as I discovered the
forgeries, I immediately notified First State Bank. I am a competent businessman
and I acted prudently, as I do in all my business, in discovering the forgeries and
advising the Bank of those forgeries on or about October 14th or 15th, 1997.


Kalantari's assertions that he examined the August statement "with promptness - within 30 days
of its receipt" and "immediately notified" the Bank do not create a fact issue. Merely stating that
he promptly examined the statement does not prove that fact and is self-serving and conclusory. 
See Brownlee v. Brownlee, 665 S.W.2d 111, 112 (Tex. 1984); Hidalgo v. Surety Sav. & Loan
Ass'n, 487 S.W.2d 702, 703 (Tex. 1972). Further, those assertions are not supported by the
evidence. The August 29 statement was deemed received by September 3; Kalantari reported the
forgeries October 16, more than forty days later. He could not both have examined the statement
within thirty days of its receipt and notified the Bank promptly; either he examined the statement
within thirty days and waited almost two weeks to notify the Bank, or he did not examine the
statement within thirty days.
4. Kalantari attached to his affidavit a list of the forgeries. Of the forty-four forgeries listed,
ten were paid between August 30, the day after the August statement was mailed, and September
17, fourteen days after it was deemed received. Those checks total $3,969.92 and are as follows:
check 6489, paid September 10; checks 6488 and 6490, paid September 12; check 6491, paid
September 15; and checks 6492, 6493, 6494, 6495, 6496, and 6497, paid September 16. 
5. Cross Creek states that no Texas case has addressed this issue, and cites us to Karmin Door
Co. v. BankBoston, N.A., No. CIV A 99-0146, 2000 Mass. Super. LEXIS 94 (Mass. Super. Ct.
Mar. 22, 2000). An employee forged numerous checks and the bank was not notified until about
twenty months after the first forgery was paid. Id. at *2-3. Karmin Door was governed by a
statute giving customers fourteen days to examine their statements and did not involve a statute-modifying account agreement. Id. at *7. The bank contended it could "only be liable for forged
checks included in the first statement . . . and any checks negotiated within the next fourteen day
period"; therefore, the issue of whether a bank is liable for checks paid during the examination
period was not decided. Id. at *6 n.4. While we have reviewed Karmin Door, we note that it is
a trial court decision from another state and is not binding authority on this Court.
6. Cross Creek urges it had the statutory thirty days. As discussed above, the Account
Agreement modified the statute and gave Cross Creek fourteen days to examine its statements.


t the initial forgeries promptly, we hold
Cross Creek may not assert a claim against the Bank for any of Jellison's forgeries. The trial
court properly granted summary judgment in favor of the Bank. We overrule Cross Creek's point
of error and affirm the trial court's judgment.



 

 Jan P. Patterson, Ju